UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ROBERT PRESTON,<br><br>               Plaintiff,<br><br>    vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>             Defendant. | 5:16-CV-05097-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, Robert Preston, M.D., seeks judicial review of the

Commissioner's final decision partially denying his application for disability

insurance benefits (DIB) under Title II of the Social Security Act.[1] Dr. Preston

has filed a complaint and has requested the court to reverse the

---

[1]DIB benefits are sometimes called "Title II benefits" and SSI benefits are sometimes called "Title XVI" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). In this case, Mr. Preston filed his application for DIB benefits only. AR 16, 202-08. He was insured through December 31, 2014. AR16. Therefore, he must establish his disability prior to this date.

Commissioner's final decision denying him disability benefits and to enter an order awarding benefits. Alternatively, Dr. Preston asks the court to remand the matter to the Commissioner for further proceedings. The matter is fully briefed and is ready for decision. For the reasons more fully explained below, the Commissioner's decision is reversed and remanded.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of the parties. See 28 U.S.C. § 636(c).

## STIPULATED FACTS[2]

### A. Procedural History

Plaintiff Robert Preston filed an application for disability dated August 29, 2013, alleging an onset date of November 14, 2009 (AR 202-208) which was denied on December 4, 2013. Exhibit 3B, AR 116-118.

He filed a Request for Reconsideration on December 11, 2013 (AR 119) which was denied on April 24, 2014. AR 122-127.

He requested a hearing (AR 128-129) which was held on April 9, 2015. Transcript of Oral Hearing AR 39-87.

---

[2] The parties filed a joint statement of material facts. See Docket No. 13. The court has reproduced those facts herein except that the medical treatment records have been rearranged to appear in chronological order instead of in order by provider (and other minor changes necessitated by the reordering). In light of the precise issues presented by this appeal, the court found a chronological recitation of Mr. Preston's medical records to be helpful. Also, the court added a few explanatory footnotes.

On August 31, 2015, the ALJ issued a partially favorable decision finding plaintiff disabled as of March 1, 2014, but not before that date.  AR 12-36.

Plaintiff requested a review of the partially favorable decision on November 2, 2015, before the Appeals Council.  AR 7-10.

The Appeals Council denied plaintiff's request to review on September 20, 2016 (AR 1-4) and this appeal followed.

**B.    Medical Evidence**

    **1.    Medical Treatment Records**

        **a.    2009**

On November 14, 2009, plaintiff was admitted to the hospital with what was eventually diagnosed as an arteriovenous malformation.  He underwent emergency surgery and was hospitalized for six days.  AR 361-412.  Plaintiff's hemiplegia[3] had resolved to a moderate hemiparesis[4] and he started expressing some words.  AR 361 (Regional Health).

He was transferred to the rehabilitation hospital for speech and motor skills therapies on December 15, 2009, and remained in treatment at Regional Rehabilitation Hospital as both an outpatient and inpatient from December 15, 2009, through June 10, 2010.  AR 361, 420-441 (Regional Health).

---

[3] Paralysis of one side of the body.

[4] Weakness on one side of the body.

### b. 2010

Plaintiff underwent occupational therapy from December 17, 2009, through January 6, 2010, which included cognitive skills training, pre-driving skills assessment.  AR 420-441 (Regional Health).

Plaintiff had improvement following his rehabilitation with none to mild impairment in his visual memory, sequencing, auditory and motor recall/recognition, auditory memory and sequencing, concrete problem solving and complex problem solving, and mental flexibility.  AR 420-421 (Regional Health).

Plaintiff demonstrated increased independence and had tested increased independence with high-level math, with minimal difficulty with functional math secondary to language impairments, specifically agnosia, which he continued being treated with speech therapy.  AR 421 (Regional Health).

At the time of his physical therapy discharge on January 6, 2010, he was independent in all activities of daily living, meal preparation tasks, and financial responsibilities, and was released to driving.  AR 420-421 (Regional Health).

Plaintiff was tested as "functional" in verbal language of a conversational level, but continued with significant difficulty with word finding and paraphasias[5] with more complex and medical information.  AR 424 (Regional Health).

---

[5] A type of language output error characterized by the production of unintended syllables, words, or phrases during the effort to speak.

His occupational therapist opined that it would be difficult for him to return to work as a physician given his continued expressive language deficits. AR 424 (Regional Health).

Plaintiff had a neuropsychological evaluation on February 16, 2010, with Dr. Scott Cherry.  AR 430-433 (Dr. Scott Cherry).  Plaintiff was reporting symptoms of increased sleep, memory deficits depending on his fatigue level, and word finding problems.  He also had difficulty in tactile sensation on the right, lots of changes in his smell and taste, occasional foot drag and dizziness upon standing.  AR 430-431 (Dr. Scott Cherry).

Dr. Cherry opined that his most profound deficits were in delayed auditory recognition, executive functioning of access to semantic memory, verbal fluency, and hypothesis testing and generation. AR 432 (Dr. Scott Cherry).  Plaintiff also demonstrated impairments of psychomotor speed, processing speed, fine motor speed bilaterally, and grip strength bilaterally on the objective testing.  AR 432 (Dr. Scott Cherry).

Dr. Cherry noted plaintiff was experiencing a significant degree of depression with associated anxiety sufficient enough to produce confusion, forgetfulness and difficulties in concentration and attention.  AR 432. Dr. Cherry opined plaintiff had somatic complaints of difficulty sleeping and fatigue which were common given his diagnosis.  AR 433.

Dr. Cherry noted the mental status examination revealed plaintiff could answer questions posed, he was cooperative and motivated, he was oriented to time, person, place and situation, he had a neat appearance, he had average

sociability, gross motor appeared appropriate, his mood and affect were appropriate to the situation and consistent throughout the evaluation, he could form logical sentences and speech sequences, and content of thought was oriented.  AR 431.

Dr. Cherry opined that plaintiff could not return to work as a practicing physician at that time and recommended a repeat neuropsychological evaluation in three to six months.  AR 433.

Plaintiff went to the Rehabilitation Medicine and Pain Center on April 27, 2010, in follow-up from his prior rehabilitation stay in 2009.  AR 808 (Rehab). He was able to remember 4 words--helicopter, NASH, encephalomyelitis, and Crohn's--immediately, after 1 minute, and after 5 to 10 minutes despite significant distraction.  AR 808 (Rehab).  Plaintiff had no overt word finding difficulties; only some hesitancy like he is rethinking how he phrases his words.  AR 808 (Rehab).  Dr. Christina Cote, D.O., opined plaintiff had marked improvement in functional abilities and tests indicated significant improvement in cognition, memory, processing speed, etc.  AR 808 (Rehab).  In fact, plaintiff corrected Dr. Cote on at least one occasion when she discussed the incorrect tendon for an injection.  AR 808 (Rehab).

Plaintiff first saw Dr. Charles Lord, psychiatrist, on June 4, 2010. Plaintiff reported difficulty sleeping, difficulty getting to sleep, waking up in the middle of the night and not being able to get back to sleep.  Since the cerebra hemotoma (CVA), he has had more significant problems sleeping.  His wife reported that he suffers a lot of anxiety as well as neurocognitive difficulties

6

following the accident.  Plaintiff denied feeling depressed although Dr. Lord indicates plaintiff had difficulty assessing his functioning according to others around him and others perceive him as having more problems than he does. He reported difficulty remembering things and having to write things down.  He did undergo rehab and has learned adaptive techniques.  He tried a selective serotonin reuptake inhibitor (SSRI) for a period of time but discontinued it due to fatigue, drowsiness and uncomfortable things and thoughts.  He described he was losing control over his emotions. He had been riding a stationary bike and doing some weight lifting and speech therapy.  The neuropsychological testing showed difficulty with executive functions, memory, verbal fluency, delayed auditory recognition, impairment and psychomotor speed and processing speed, grip strength and fine motor speed bilaterally.  The testing also demonstrated a depression with anxiety tied to his confusion and forgetfulness, difficulty concentrating, and focus and attention.  Dr. Lord felt this to be consistent with bilateral, frontal lobe involvement and subcortical involvement.  AR 777-778 (Dr. Lord).

Dr. Lord noted that plaintiff's aphasia has been improving and improvement in motor involvement.  However his difficulty with sleep, anxiety and mood were significant enough that he presented to Dr. Lord for treatment. AR 777-778 (Dr. Lord).

On mental status examination, plaintiff's speech was reasonably clear, but had difficulty finding words.  Affect was tense and anxious, but no extreme lability.  Thought processes were reasonably clear and logical.  Auditory

reception was good, although it took some time to recognize certain questions and respond.  He admitted to worrying about the future.  He was looking forward to being involved in [an] intensive rehabilitation program that would help him with the difficulties he is having.  He worried about his wife and her dealing with his debilitation.  He was looking forward to getting back to some of the river boat rafting and some other activities that he and his wife enjoyed previously.  He has difficulty organizing around those kinds of issues and planning.  He felt that his friends and family were quite invested in him and getting him back to his routine there.  His sensorium[6] was relatively clear, however, upon demands for concentration he gets somewhat confused and struggles to find appropriate responses.  He has had a reasonably good physical recovery.  He hopes to have more neurocognitive recovery as well.  Dr. Lord assessed his global assessment of functioning ("GAF") between a 49 and a 51.[7]  AR 780 (Dr. Lord).

Dr. Lord recommended medication for sleep and mood stabilizing agent medication.  AR 780 (Dr. Lord).

Plaintiff saw Dr. Lord on June 14, 2010, with his wife Krista.  They discussed his change in his sleep issues and his difficulty sleeping following

---

[6] The sensory faculties considered as a whole.

[7]GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most healthy mentally.  A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty.  Nowling v. Colvin, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016).

the AV malformation bleed.  AR 774 (Dr. Lord). Dr. Lord opined that while he has gained a lot of physical function and cognitive function, he remains fragile, fatigued, anxiety, apprehension and dysphoria.  Dr. Lord estimated his GAF at 49 to 50. AR 775 (Dr. Lord).

Plaintiff returned to Dr. Lord on July 5, 2010.  They discussed that he had gone to Colorado for a trip with friends who wanted to do some rafting.  Dr. Preston enjoyed the trip.  He didn't have any anhedonoia or dysphoria, but reported anxiety at times that could be disorganizing.  His sleep continued to be a problem, getting only four to five hours a night and waking frequently.  His GAF was estimated at 48 to 50 and at the appointment, he demonstrated word finding, concentration, focus, and executive dysfunction issues.  AR 773 (Dr. Lord).

Plaintiff attended an intensive brain injury rehabilitation day program in New York from September 7, 2010, through February 10, 2011 (first cycle) and returned for the second cycle from March 11, 2011, through July 28, 2011.  AR 442-636 (NYU Lagone).  The brain injury rehabilitation program structures, and short and long term goals and objectives are outlined at AR 490-491 (NYU Lagone).

Plaintiff underwent a baseline neuropsychological evaluation on June 17, 2010.  AR 521 (NYU Lagone).  He underwent subsequent evaluation on July 20, 21 and 22, 2010, and on August 5, 2010, the staff found plaintiff would benefit with undergoing a second cycle.  AR 530 (NYU Lagone).

He returned to Dr. Lord on July 26, 2010. The new medication prescribed, Depakote, did not work out well. While it helped him sleep, it made him feel heavy and lethargic. His GAF was estimated at 49 to 50. Plaintiff reported that he had been to New York to a head injury program (i.e., the NYU Lagone Medical Center), and they have accepted him where he would start in September. Plaintiff reported fatigue and apprehension but no significant dysphoria, anhedonia, or anxiety. AR 772 (Dr. Lord).

Plaintiff returned to Dr. Lord on August 9, 2010. Estimated GAF was 49 to 50. He reported fatigue, weakness and the like. AR 771 (Dr. Lord).

At a follow-up examination with Dr. James Bowman, M.D., (at Regional Health) on August 20, 2010, plaintiff had no focal deficits, sentence construction and overall response were fairly well preserved, and there was somewhat slow on some of the synthesis. AR 700 (Dr. Bowman).

In [an] appointment of August 30, 2010, [with Dr. Lord] plaintiff reported sleeping much better since on the medication Temazepam. However, there were days when he was tired and had fatigue and energy problems. Dr. Lord specifically noted "For example, in the waiting room, he will often be sleeping, but again quite consistent with his post CVA course." AR 770 (Dr. Lord).

His progress and treatment [at the NYU head injury program] from October 4 through 28 of 2010, is summarized in the November 5, 2010, letter to his treating psychiatrist, Dr. Charles Lord. AR 493-497 (NYU Lagone). Plaintiff was initially found to be impaired (from mild to severe range) on several standard computerized measures of basic attention and concentration.

As a result of intensive remedial training, plaintiff showed marked improvement in his attentional functions and he now tested within normal limits on standard computerized measures of attention and concentration. AR 493 (NYU Lagone). He was also better able to track the discussion and to respond in a more targeted manner; and when away from the program he is now more able to follow conversations and read the newspapers and journal articles, but is still vulnerable to distractions. AR 493-494 (NYU Lagone).

Plaintiff integrated well into the therapeutic community, engaging wholeheartedly and diligently in all group remedial sessions; he is well liked by his peers, and was compassionate toward them; and he mostly smoothly works around his expressive aphasic difficulties with more active participation, and more relevant, targeted and understandable responses. AR 494 (NYU Lagone).

On October 7, 2010, plaintiff saw Dr. Lord again and reported that he was now attending the Rusk Head Injury Institute at NYU Lagone Medical Center, and learning of ways to deal with his loss of function. Estimated GAF was around 50. AR 769 (Dr. Lord).

Plaintiff's progress from November 1 through November 30, 2010, at the [NYU] brain injury day treatment program was summarized in the program's letter to his treating psychiatrist, Dr. Charles Lord, dated December 6, 2010. AR 511-513. Plaintiff developed two 250-word speeches, integrated them into a 300-word written personal statement, and presented it to a friendly audience. AR 511-512 (NYU Lagone).

Plaintiff, with his counselor and wife, prepared a detailed plan of activities for a 10-day "working break" from the program. AR 512 (NYU Lagone). Plaintiff proved successful in using his daily planner to record his ability to adhere to his schedule; increased his awareness; utilized a self-monitoring checklist; and maintained a record of his daily progress and difficulties encountered. AR 512 (NYU Lagone). Plaintiff worked collaboratively with his home coach (his wife) who cued him to take a break when she observed signs of neurofatigue. AR 512 (NYU Lagone). The program identified areas of vulnerability requiring further remedial attention. These included plaintiff's need to learn more about how his multiple deficits interact and impact his daily life functioning; become better at self-monitoring for early signs of deficits so that he could apply compensatory techniques; systematically practice these compensatory techniques so that they could become habituated, thus enhancing his functional life competence. AR 513 (NYU Lagone).

His progress from December 1, 2010, through December 16, 2010, is summarized in the letter from NYU Lagone Medical Center to Dr. Lord dated January 7, 2011. AR 509-510 (NYU Lagone). Dr. Lord was advised that plaintiff's ability to remain optimally focused and engaged throughout interpersonal group sessions was improved (by building in "preemptive" neurofatigue breaks, self-cuing to take notes and preplanning his responses in writing). AR 509 (NYU Lagone). Plaintiff was also more effectively – calmly and smoothly – working around his expressive aphasic problems through

application of verification strategies.  AR 510 (NYU Lagone).  His responses are more targeted and fluid, he is more relaxed and self-assured when speaking, and his wife reported very positive feedback from family and friends concerning plaintiff's willingness to engage actively in discussions, his initiation of activities, and his increased self-confidence.  AR 510 (NYU Lagone).

He returned to Dr. Lord on December 21, 2010.  He reported he was back from his brain injury program and was considering doing another cycle of rehabilitation. At his apartment in New York, he reported that he would sleep four to five hours, be awake for a half hour and then go back to sleep for another couple hours.  His wife, son and daughter were all there spending time and helping him through the brain injury rehabilitation process.  His GAF was estimated at 48 to 50 and Dr. Lord noted that he was reasonably alert and cooperative and coherent throughout the examination.  AR 768 (Dr. Lord).

### c.    2011

[Back at NYU] Plaintiff's individual and group sessions occurred between 10:00 a.m. and 3:00 p.m., at the NYU Rusk Institute Brain Injury Day Treatment Program with Licensed Mental Health Counselor (LMHC) Ellen Daniels-Zide, Ed. D., who noted plaintiff was fully focused and engaged at sessions on January 3, 4, 5, 6, 10, 11 and 13, 2011.  AR 592-597 (NYU Lagone).  In the afternoon on January 18, 2011, the LMHC notices plaintiff was engaged and focused during speech writing "though he required neurofatigue breaks."  AR 598 (NYU Lagone).  At the subsequent community session later that afternoon, he had increased neurofatigue but was focused, engaged, cued

self to use verification strategy to remain engaged and clarify understanding. AR 598 (NYU Lagone).

On Wednesday, January 19, 2011, LMHC Daniels-Zide notes in the afternoon session between 2:30 and 3:00 p.m. state: "Very neurofatigued. Difficulty sustaining focus . . . required frequent neurofatigue breaks." AR 599 (NYU Lagone). He is "prone to neurofatigue." AR 599 (NYU Lagone).

On January 20, 2011, LMHC Daniels-Zide documents "increasingly neurofatigued," but he was able to re-engage strategies to remain focused and check accuracy. AR 600 (NYU Lagone). LMHC Daniels-Zide did not note any neurofatigue on January 21, 2011. AR 601 (NYU Lagone).

During the late afternoon session on January 24, 2011, LMHC Daniels-Zide documents "Very neurofatigued (yawning; eyes closing). Required frequent/longer breaks. Difficulty elaborating ideas." AR 602 (NYU Lagone). LMHC Daniels-Zide did not note any neurofatigue on January 25, 2011. AR 603 (NYU Lagone).

During the late afternoon session on January 26, 2011, LMHC Daniels-Zide again notes "Very neurofatigued. Greater problems processing information. Accepted staff cues to employ compensatory strategies." AR 604 (NYU Lagone). On January 31, 2011, LMHC Daniels-Zide notes "Very prone to neurofatigue." AR 606 (NYU Lagone). At the later occurring session that afternoon plaintiff was punctual, participated appropriately, volunteered to contribute to discussion, made relevant comments, and was empathetic to peers. AR 606 (NYU Lagone).

On February 1, 2011, LMHC Daniels-Zide notes that he participated appropriately though he was neurofatigued (yawning and voice low). AR 607 (NYU Lagone). He was able to use strategies to stay engaged and focused. AR 607 (NYU Lagone).

LMHC Daniels-Zide noted February 2, 2011, again that plaintiff was prone to neurofatigue and his errors were increased when reading and slower processing. AR 608 (NYU Lagone). Yet, during the afternoon sessions he was fully engaged and focused. AR 608 (NYU Lagone). Plaintiff did not have neurofatigue noted on February 3, 7, 8, 9 and 10, 2011. AR 609-613 (NYU Lagone).

Plaintiff was retested [at NYU] through neuropsychological testing in February of 2011, where he showed improvements in his attention, reaction, visual discrimination, conditioner, time estimation tests. The doctors concluded that plaintiff's basic attention and concentration functions had improved to be now within normal range. AR 504 (NYU Lagone). His visual perception domain improved with the exception of one of the tests. AR 505 (NYU Lagone). His performance remained moderately impaired on a test of word fluency and mental control. This test has been shown to be sensitive to frontal lobe dysfunctioning. He remained in need of further intensive remedial training. Plaintiff made significant gains in the area of language and communication in his functional life. AR 506 (NYU Lagone). His memory function remained in the mildly to moderately impaired range. AR 506 (NYU

Lagone).  He remained severely impaired in several of the higher level reasoning domain testing.  AR 507 (NYU Lagone).

[Plaintiff] saw Dr. Lord on March 1, 2011 with an estimated GAF of 48 to 50.  He was reasonably alert, cooperative, and coherent throughout.  AR767 (Dr. Lord).

Plaintiff did not have neurofatigue noted on March 7, 8, 9, 10, 14, 15, 16, 17, 21 and 22, 2011. AR 614-623 (NYU Lagone).

On March 23, 2011, plaintiff was verifying his strategies more often but still required cuing.  He did ask for a neurofatigue break but able to re-engage.  AR 624 (NYU Lagone).  On March 24, 2011, LMHC Daniels-Zide again notes that he is prone to neurofatigue which slows processing and decreases accuracy.  AR 625 (NYU Lagone).

On March 28, 2011, LMHC Daniels-Zide notes that plaintiff's neurofatigue slowed his processing and increased his aphasic problems.  In his individual counseling on that day, the doctor discussed monitoring for early signs of deficits so that he can apply strategies and he was receptive to coaching prompts.  AR 626 (NYU Lagone).  LMHC Daniels-Zide notes that she discussed [with Mrs. Preston] the nature of her husband's brain injury (permanence, limitations in neurofatigue) and discussed with her how to detect early signs.  AR 626 (NYU Lagone).

On March 29, 2011, LMHC Daniels-Zide again notes that he becomes very neurofatigued and he requested frequent breaks.  Processing was

significantly slowed and he was less accurate with his neurofatigue.  AR 627 (NYU Lagone).

On March 30, 2011, LMHC Daniels-Zide also notes that he was neurofatigued but was able to stay engaged and was receptive to staff prompts to verify and stay alert.  The doctor again noted that he was prone to neurofatigue which slowed his processing and reduced accuracy.  AR 628 (NYU Lagone).

On May 9, 2011, plaintiff saw Dr. Lord who noted he still had significant problems with neurocognitive function but was more fluent and was able to use strategies to help with recall and retention.  He had memory issues and indicated that sometimes he even forgets that he has memory issues.  He continued to have difficulties with his sleep, co-morbid anxiety and mood related issues.  His GAF was estimated around 48 to 50.  AR 766 (Dr. Lord).

In the [NYU] discharge summary dated August 5, 2011, LMHC Daniels-Zide and David Biderman, Ph.D., recommend "Dr. Preston should continue to review (on his own and with his wife, his "home coach") his program notes and DVDs.  This will be necessary to maintain his awareness and understanding (despite the presence of memory gaps); and help him recall and systemically apply his learned compensatory techniques so that they could become habituated, and thus fully integrated into his functional life repertoires."  AR 442 (NYU Lagone).  Plaintiff accepted the fact he could not return to his medical practice, and there was no doubt plaintiff benefited from his

participation in the treatment program and had become more functionally competent. AR 442-443 (NYU Lagone).

On August 31, 2011, plaintiff told Dr. Bowman he did not have speech difficulties or memory lapses or memory loss. AR 654 (Dr. Bowman). The medical findings showed plaintiff was fully oriented, he had a normal mood and affect, he was cooperative, active, and alert, and he had good judgment. AR 655 (Dr. Bowman).

After plaintiff completed his NYU Lagone Medical Center's rehabilitation program, he saw Dr. Lord on August 31, 2011, [the same day as the above-noted visit with Dr. Bowman] and reported he had difficulty with recall and some neurocognitive difficulties when there are interruptions midstream. He often will lose track of what he was talking about with only a minor interruption. He had a book with him which is a reminder that he writes things down every day regarding schedules and important meetings. AR 765. Dr. Lord noted plaintiff was coherent and logical throughout the interview, he was cooperative, alert and personable, and he was oriented to person, place and time. AR 765 (Dr. Lord). He enjoyed going to his medical clinic and helping out, and admitted the rehabilitation program helped him a lot regarding adjusting to his post-stroke course. AR 765 (Dr. Lord).

He returned to Dr. Lord on October 28, 2011, and reported that he had a seizure since his last appointment. He had gone on a river boat excursion and he said it was way too much stress. He had a beer at the end of a couple of

days and had a seizure. It was nocturnal and he had not taken his temazepam medication that night. Estimated GAF was 50 to 52. AR 764 (Dr. Lord).

Plaintiff returned to Rapid City Regional Hospital in October 2011, and the mental status examination indicated he was awake and alert with appropriate attention, cognition and fund of knowledge may be slightly decreased from an executive functioning standpoint, but it was not thoroughly assessed in that setting. AR 806 (Regional Health—Dr. Robert Finley). Plaintiff was cooperative, followed commands and answered questions appropriately. AR 806 (Regional Health-Finley). Plaintiff was deemed to have "done very well with significant improvement" of right-sided motor function, and "significant cognitive improvements." AR 806 (Regional Health-Finley).

Plaintiff underwent a sleep study (polysomnograph) [also at Regional], which confirmed the presence of moderate Obstructive Sleep Apnea Syndrome. AR 730 (Regional Health--Finley). Plaintiff was prescribed a Continuous Positive Airway Pressure (CPAP) machine with a setting of 7 cm H2O. AR 730 (Regional Health--Finely). He achieved a sleep efficiency of 96 percent when he slept 6 hours and 57.5 minutes with time in bed of 7 hours and 16.5 minutes. AR 731 (Regional Health--Finley).

He saw Dr. Lord on December 28, 2011. He reported that he was a little depressed after his seizure and didn't remember things and was obviously agitated. He said the seizure happened after he was sleep deprived, drove long hours on the road to get home, and had a beer after the river trip. He was feeling better now and staying away from alcohol. He reported that he was

19

working in his own medical clinic in an administrative role. Estimated GAF of 50 to 54. When talking about his wife, his work, their marriage and teamwork, he was labile. He was on the verge of tears regarding his affects as it relates to the losses and the stressors. AR 763 (Dr. Lord).

### d. 2012

On [Plaintiff's] appointment of March 8, 2012, [with Dr. Lord] they talked about some different medications to help him sleep. He had anxiety and mood related issues. He reported that he was enjoying skiing and his physical strength was good but he was fatiguing easier than before. Estimated GAF of 50 to 52. He continued to work in his clinic in the administrative role. AR 762 (Dr. Lord).

When plaintiff returned to Dr. Bowman in April 2012, he denied memory lapses, memory loss, or speech difficulties. AR 650-651 (Dr. Bowman). Plaintiff was fully oriented, had a normal mood and affect, he was cooperative, active and alert and he exhibited good judgment. AR 651 (Dr. Bowman).

When plaintiff returned to Rapid City Hospital in May 2012, he reported he was struggling with adjusting to sleeping with the CPAP mask. AR 796 (Regional Health--Finley). He also reported he had a nocturnal seizure in December 2011, which the treating doctor deemed related to significant sleep deprivation. AR796 (Regional Health--Finley). Plaintiff reported that on a regular basis he does a lot of river running, camping, doing an excessive amount of work in and out of the river and loading boats, etc. AR 796 (Regional Health--Finley). The mental status examination showed he was

awake and alert, he had appropriate attention, cognition and fund of knowledge were stable, he could answer questions and follow commands, and he was cooperative. AR 796 (Regional Health--Finley).

[With Dr. Lord] On May 3, 2012, he talked about having some trips planned regarding his obsession of river rafting, which he enjoys. He was encouraged to diet and exercise moderately. His GAF was 52 to 53. AR 761 (Dr. Lord).

On August 23, 2012, he reported [to Dr. Lord] he was doing well on Lamictal. He has worked hard to get back into the clinic where he was working in the business part of it. His concentration and focus were reasonably good and he was mildly disheveled. His GAF was estimated at 52 to 53. AR 760 (Dr. Lord).

Plaintiff again denied memory lapses, memory loss or speech difficulties when he saw Dr. Bowman in August 2012. AR 647 (Dr. Bowman). Plaintiff was fully oriented, had a normal mood and affect, he was cooperative, active, and alert, and he exhibited good judgment. AR 647 (Dr. Bowman).

In November 2012, plaintiff told Dr. Bowman he did not have memory lapses, memory loss, or speech difficulties. AR 643 (Dr. Bowman). Plaintiff was fully oriented, had a normal mood and affect, he was cooperative, active, and alert, and he exhibited good judgment. AR 644 (Dr. Bowman).

On November 21, 2012, Plaintiff's wife Krista came with him to his appointment with Dr. Lord. She talked about some of the stressors. They were

looking at selling their clinic to a hospital. Plaintiff continued to work at the clinic. Estimated GAF was 50 to 53. AR 759 (Dr. Lord).

### e. 2013

On February 20, 2013, plaintiff saw Dr. Lord. They talked about what he learned at the head injury program at NYU and that helps him in managing his symptoms. The program helped him find ways to deal with his deficits. He continued to discuss selling their practice or trying to continue to manage it. estimated GAF was 50 to 53. AR 757 (Dr. Lord).

In March 2013, plaintiff again denied having memory lapses, memory loss, or speech difficulties in an appointment at Regional Health. AR 793 (Regional Health--Finley). Plaintiff was fully oriented, his recent and remote memory were intact, fund of knowledge was intact, attention span and concentration were normal, language receptive and expressive languages were normal, and he had an appropriate mood and affect. AR 793 (Regional Health--Finley).

When plaintiff returned to Dr. Bowman in April 2013, he denied having stress and sleep disturbances. AR 639 (Dr. Bowman). The mental status examination showed plaintiff was fully oriented, had a normal mood and affect, he was cooperative, active and alert, and he exhibited good judgment. AR 640 (Dr. Bowman).

In September 2013, plaintiff reported having a busy summer and going out on a couple boating trips. AR 788 (Regional Health--Finley). He tries to stay active and does a fair amount of walking on a regular basis. AR 788

(Regional Health--Finley).  He had no mental function complaints, and the mental status examination showed plaintiff was fully oriented, he had intact recent and remote memory, fund of knowledge, attention span, concentration, language receptive and expressive language, and mood and affect.  AR 789 (Regional Health--Finley).

In [an] appointment of September 16, 2013, Dr. Lord noted that plaintiff continued with his forced retirement secondary to his CVA.  He noted that plaintiff recently sold his medical clinic to a hospital.  Even with the medication, he only gets about five to six hours of sleep.  Dr. Lord talked about trying long-acting melatonin to see if it would be helpful in sleeping longer so that he would take less naps.  Dr. Lord noted "He still has neurological fatigue and takes naps.  He doesn't feel he would be very useful even as a greeter at Walmart as he gets fatigued easily and needs to sleep."  His GAF was estimated at 50 to 53.  AR 755 (Dr. Lord).  Dr. Lord noted that he continued "to have reports of neurological fatigue and mood swings that are intermittent and mild."  AR 756.  The mental status findings showed plaintiff was alert, cooperative, coherent, and oriented; verbal production was within normal limits; he was dressed casually and appropriately; he continued to have some difficulty with word finding and complex issues; he was able to calculate and abstract throughout the interview.  AR 756 (Dr. Lord).  Plaintiff had no further seizures since avoiding alcohol, and he continued to enjoy going on trips, boating, rafting, and remaining active.  AR 756 (Dr. Lord).

[With Dr. Bowman] Plaintiff reported he had no stress, sleep disturbances, or other psychiatric issues, memory lapses, memory loss, or speech difficulties [during an] October 25, 2013, examination. AR 861 (Dr. Bowman). The mental status examination showed plaintiff was fully oriented, had a normal mood and affect, he was cooperative, active and alert, and he exhibited good judgment. AR 862 (Dr. Bowman).

### f.     2014

When [Plaintiff] returned to Dr. Lord on March 3, 2014, plaintiff reported he had neurological fatigue and often naps. He cannot go more than a couple of hours without feeling fatigued. AR 870 (Dr. Lord).

He returned to Dr. Lord on September 10, 2014, where Dr. Lord reported that he has fatigue and has a hard time getting things done. He can still operate his forklift/bobcat and do some things around the place, but he gets tired and this is frustrating for him. He says he could last about three to four hours at most with his concentration and focus and then he has to rest. AR 883. He talked about his trip to the Grand Canyon with his family and the fatigue that it caused. He says that he is not sure he could do it again nor does he want to. He talked about the weddings of two of his children which were very stressful. He tries to stay out of things that are too stressful for him. AR 883 (Dr. Lord).

### 2.     Dr. Lord's Opinions as to Residual Functional Capacity – Medical Source Statement Dated [December 7], 2014. (AR 888-890)

Dr. Lord has been treating Dr. Preston since June 4, 2010. AR 777-780.

Dr. Lord was asked for his opinions with respect to plaintiff's description of his symptoms and limitations, Dr. Lord circled YES to indicate that the subjective symptoms and limitations plaintiff described were consistent with his medical condition. Dr. Lord noted left frontal CVA impairs the emotions/attention, executive function, right motor activity and impulsivity/compulsivity related circuits in the human brain. Rest is required to partially compensate for these chronic dysfunctions due to circuit damage. AR 889, 890.

Dr. Lord circled YES to indicate that the neurofatigue breaks that plaintiff alleged are necessary to help maintain his function would be expected to continue into the indefinite future. AR 889-890. Dr. Lord noted that generally the usual time frame to get back to what functions you can post CVA traumatic brain injury is two years. He responded YES to the question whether plaintiff's limitations after two years would be permanent. AR 889-890.

## C.    Dr. Preston's Self-Reported Functional Capacities

### 1.    Function Report Dated October 3, 2013 (AR 251-260)

Plaintiff reported he suffered a stroke on November 14, 2009, and after rehabilitation he was told he could not go back to work as a practicing physician. AR 251, 258.

His admitted activities included feeding the four dogs (when he wakes up in time, otherwise his wife handles this task), see to it his two horses have hay and water, and taking at least two neurofatigue breaks, usually naps. AR 252.

In response to what he was able to do before his illness that he cannot do now he responded, "Practice medicine.  Do any activities that require concentration no more than two hours at one time."  AR 252.

His sleep is impacted and he has to wake about 2:30 to 3:30 a.m. to use the bathroom and it usually takes him about two hours to get back to sleep. AR 252.

## 2.    Disability Report Dated December 13, 2013 (AR 263-268)

Plaintiff reported he had neurofatigue that was identified by his psychologists at NYU which causes the need for him to take 10 to 15 minute rests, that occasionally, may turn into a two to three hour nap.  These occur every two to three hours.  When he is neurofatigued, all his deficits are accentuated.  AR 263.

When asked the approximate date the changes occurred, plaintiff noted the neurofatigue started on November 22, 2009.  AR 263.

Plaintiff explained in the remarks section that "Initially, I had no use of the right side of may [sic] body, and could not speak.  My movement has improved but I still have weakness in my right leg and ankle, accompanied by the tendency for my right foot to turn out.  Furthermore, I have a condition called aphasia; in other words, I have trouble finding the right words to say. Also, I still have a deficiency in memory (both short and long term), awareness and concentration, processing information, executive functions, proper social etiquette, spelling, reading, and typing.  Epileptic seizure is another condition that is controlled with a drug prescribed by my neurologist.  The side effect of

this drug, which I experience, include incoordination, fatigue, periodic dizziness, headaches and appetite suppression.  Another condition that plagues me is a condition called by my psychologist at NYU, neurofatige [sic], where I am compelled to take a 10-15 minute rest that, occasionally, may turn into a 2-3 hour nap.  These occur every two to three hours during the day. When I am neurofatigued, all my above deficits are accentuated."  AR 267.

### 3.     Disability Report Dated June 18, 2014 (AR 269-274)

Plaintiff reports no changes in his function since his disability report of December 13, 2013.  AR 272.

He reports "My activities are pretty much the same.  In times where there is more stress or changes in my routine – I need to take more naps and breaks."  AR 272.

### D.     Third Party Observations of Plaintiff--Krista Preston

Plaintiff's wife, Krista Preston, also the officer manager for their medical clinic called Rapid Care, submitted statements and filled out a Work Activity Report for plaintiff because he received payments from the company and attempted to return to work at Rapid Care following his stroke in November of 2009.  AR 292-347.

Krista Preston stated plaintiff tried to go into the clinic to work on clinician schedules with her, but it was clear he was not able to do this. AR 300.  He tried to come into the office a couple times per week, generally he stayed for only an hour or less.  Most often he came in to chat with his longtime staff and to check the mail.  We tried for him to find a "new place" in

HIS business, but it just didn't work due to the deficits caused by the brain injury. Neurofatigue is ever present. He needs a nap several times a day. In addition, he had trouble with short term memory, information processing and adynamia.[8] Eventually, the business was sold to Regional Health Physicians on July 31, 2013. AR 301.

**E.    Testimony at Administrative Hearing**

**1.    Plaintiff**

Plaintiff alleges disability from November 14, 2009. AR 45. He was born in February 1949. AR 45. He lives in a house that sits on 50 acres of land. AR 45-56. His house is multilevel and when asked if he has problems negotiating from floor to floor in the house, he responded "I have – we have railings. We have banisters, but I don't use them always . . . just part of the time – if I have any problems." AR 46. He didn't drive for about a month after his stroke but does drive now. AR 46.

In describing his work history, he testified "I practiced for a while in Hot Springs, South Dakota, which is about three hours, it's about  - - so it's about 60 miles south of Rapid City and so I practiced as an internist, but I didn't care for the practice much. So yeah, and I reopened the – we opened Rapid Care in 1990, so." AR 47.

Plaintiff used to see Dr. Lord about every three months and now it's changed to once every six months. AR 48.

_____

[8] Adynamia is a lack of strength or vigor often associated with a neurological condition.

He tried to remain active "running the rivers" trying to do easier ones but is very tired afterwards.  AR 48-49.  He had just recently returned from a six-day trip down the Green River with his wife and six other participants.  AR 49.  When asked whether he was guiding that trip he responded "It's a private trip. I haven't guided a trip since I quit in – I managed a rafting company for four years and I also worked at the rafting company for three years in California and then four years in Utah and quit in 1979."  AR 49.

During the trips they camp at night, fix meals at night, fix lunches during the day, move down the river and camp out.  AR 50.  They divide the duties up between the six participants.  AR 50.

As far as Dr. Preston's activity, he doesn't usually get involved in mapping out a route, most of the time he just paddles a canoe.  AR 51.  He was asked whether he was able to participate in things and he responded "Well, there was one night I wasn't able to participate because of fatigue, but I hiked considerably or with everybody else after not taking a break for all that time." AR 52.

He still does weed-eating and mowing around his property.  He explained "But I only spend like only two to three hours doing that, most activities . . . and then I get tired, very tired.  AR 53.  His wife will help him figure out where to weed-eat and mow.  AR 53.  He is able to change the oil and sharpen the blades on his riding lawn mower.  AR 54.

He testified it was very frustrating when he tried to return to do some work at the clinic because he made mistakes.  AR 54.

He tried to do a schedule for a physician's assistant and it just didn't work out. "I just never got it right for him." AR 54.

He and his wife ride a Harley trike. AR 55. He went on a trip with friends to the Grand Canyon the August before the hearing. He had to stop for breaks and the trip went ok. AR 55.

When asked whether he had any difficulty negotiating traffic or following the path that he needed to take, he responded "About anyone does driving through your town. We went as far as – it was frustrating at times but, yeah, I worried about it. My wife actually didn't ride with me to Denver. She rented a car and I drove – her car, so." AR 56.

He testified "I drove from Rapid City. I went with a – I went the way through Wyoming – I mean, the back roads through Wyoming and in Western Colorado and then we were going with a couple and then, oh, and she rented a a car in Moab, Utah – and she was afraid to ride over – you know how Interstate 70 – it's crowded all the time – and it was actually more crowded because that there was road damage when we went – there in August and I think it was August. I don't remember. We had to wait a long time the way – how it was. AR 56-57.

He was asked whether he was traveling with another couple or by himself by the Administrative Law Judge and responded "No, I went – the other couple, we had – and I think we dumped them –I think we let them go on to Moab. We let them go by themselves and we stopped and stick sometimes to the plan." AR 57. He tried to do part of the trip on his own at Vail and Eisenhower

Tunnel, but he picked up Krista in Fort Collins and she had to warn me, we almost – and I almost pulled in front of a truck --.  AR 57.

Plaintiff testified that rafting was an important part of his life because he was a guide for several years.  AR 58.  The rafting trips that he takes now, he does only one or maybe two a year, and he's not guiding, he just goes with friends.  AR 58.  He testified the last time he guided was in 1974.  AR 58.  Earlier he had testified it was 1979.  AR 19.  It was difficult for him to get back to rafting after his stroke.  He never turned a boat over until after his stroke and then he flipped one in 2010, he believes.  AR 59.

It was important for him to continue the relationships and friendships through rafting.  He explained that before the event he used to raft a lot and he used to raft two to five times a year and lately he had done it once or twice and that it all he could.  AR 59.  When he returns back home after a rafting trip it takes him a while to recover from that.  At the time of the hearing (dated April 9, 2015), he was still recovering from the trip and he got back Easter Sunday (four days before the hearing) and even though he's getting eight hours of sleep, he's still fatigued.  AR 60.

He continues to ski but can only ski for maybe an hour and a half.  He had been skiing for over 40 years.  AR 60.  He can't ski longer because of his fatigue.  AR 61.  He feels that he doesn't have the same coordination and balance and he skis slower and has had near accidents but it's beneficial to his self-esteem.  AR 61.  When asked if these activities help him emotionally, he responded "Yeah.  Yeah, I think it does.  I"  AR 61.  He has a longtime friend

who has encouraged him to stay active in skiing and join a ski club that's one hour.

He was asked about his work after the stroke and whether he was paid a salary since his stroke or was it vacation pay. He responded "I think would be better if you talked to Krista about it because to be honest, I can't really explain it." AR 63.

He wasn't working anywhere near even 20 hours a week doing chores, yard work or any type of work for wages and he responded "No. No, not at all." AR 63.

He sees his wife every day pretty consistently throughout the day. He explained "She goes to town a lot and I go too and we both go to town." AR 64. He testified Krista, his wife, is retired and "she's trying to delegate me constantly." AR 64.

He was asked the question of whether he is always aware when he is having more difficulties or is that something that one of his friends or his wife would point out to him that maybe he needs to back off or his response "Well I'm not sure I know what – I'm not sure I understand your question. Maybe if you could explain that again." He continued "Yeah, I can usually pick it up myself, though, especially when I'm tired, that sometimes I can." AR 64

His wife organizes his activities and schedules at home. AR 64. He thinks she helps with his medication and reminders. AR 64.

When he has more stress, he explained it makes him very fatigued and he doesn't know what to say. AR 65. When asked whether he felt he could do

any type of work on a regular basis forty hours a week, day in and day out, he responded, "Oh, I don't think I'm really capable because I can only work approximately three hours and then I need to take a break and then . . . usually break, but sometimes naps."  He was asked how many days out of an average week would he need longer rest breaks of between an hour or an hour and a half and he responded "About three days out of a month."  AR 65.  And about half the days, he's going to need longer breaks.  AR 65.  The ALJ asked plaintiff if he had noticed any increase in his fatigue or ability to sustain activity since 2009 and whether he had noticed a decline in the last year or so where he was not able to keep up pace and he got tired more easily.  He responded "Not really, no, I haven't changed that."  AR 66.

### 2.    Krista Preston

Krista Preston has been married to plaintiff for almost 33 years at the time of the hearing.  AR 68.

They started the business, Rapid Care, together. AR 68.

She attended the treatment with plaintiff at the Rusk Institute in New York.  AR 68.  As a significant other, she was an integral part of their program. AR 68.  The program was very beneficial to both of them as it opened their eyes to what stroke is all about.  He's never going to be the same and that's a transition that she is still working on. AR 69.  For Krista and plaintiff there was a therapeutic community set up at the Brain Injury Program to help plaintiff regain self-confidence.  AR 69.

When they returned from the Brain Injury Program in the Summer of [2011],[9] she worked at trying to get plaintiff back to some level of activity. AR 69. Krista explained that she played a big role in that they continued on as they had before his stroke. She tried to manage the clinic payroll and everything that she could when she was in New York with the use of computers and the help of her staff at home in Rapid City. AR 69.

Krista testified that they knew he couldn't work as a clinician anymore "but when a person has this sort of change in life, you've got to keep them involved as much as you can keep them involved. And so I had him and he wanted to try to do schedules for the clinicians and the lab and nursing staff." AR 70. They tried to find something he could do, both for his own self-esteem and the morale of the staff. It was good for them to see that Dr. Preston was in the clinic. AR 70. She explained that the attempts to keep Dr. Preston involved in his business of Rapid Care with the scheduling, etc. were not successful. AR 70.

Krista testified "It was a bitterswett experience really because it was just obvious that he wasn't going to be able to do it and it was also demoralizing." AR 70. He would get people mixed up with days and kept forgetting where the paper is and who requested what time, etc. AR 70. He was not working regular working hours. AR 70. Krista explained that he would come in an hour or two a day. At times he would say "oh I need to go to town to go to

---

[9] The joint statement of facts states Krista said "2001," but the NYU records clearly show Dr. Preston attended their program from 2010 to 2011.

Safeway and pick up some yogurt or something.  Or I'll go pick up some dog food and I might come in to work on the schedule."  Krista testified it was a sense of pride for him to say that I'm going to come in to work on the schedule. She knew, however, that he was having a very hard time with that.  AR 71.

He would get people mixed up with days and kept forgetting where the paper is and who requested what time, etc.  AR 70.  Krista testified that plaintiff would come in the office and he would go to sleep in his office.  People would knock on the door and it would be embarrassing for those people because plaintiff would be asleep in his office.  AR 71.  It was just very obvious that it wasn't working out.  AR 71.  Krista explained that plaintiff didn't work full hours but he continued to receive full wages following the stroke, classified as sick pay.  AR 74.

With respect to his rafting, they had recently gone on a rafting trip to Utah, leaving on a Monday and returning on Easter Sunday (four days before the hearing).  AR 75.  She explained that they have been doing this for 30 years.  However, this one was a canoe trip.  It's not white water rafting like they used to do, just flat water trip with friends.  AR 75.  The days on the river are pretty routine and they had the trip leader who was in charge of mapping out the routes.  AR 75-76.  She described the difficulty that he had on the trip, explaining that plaintiff was very quiet when sitting around the camp because he really didn't understand what people were talking about.  AR 76. Dr. Preston went to bed earlier than everyone else.  She explained he always sets his own pace that way.  AR 76.  She explained that after these trips (which

they take once a year for a week) it takes its toll with the deficits he has. AR 76.

Krista testified that with respect to Dr. Preston's activities throughout the day "he's pretty much tired 24/7, if you ask me." AR 76. He wakes up tired and he's tired when he goes to bed. His best time is in the morning. Two cups of coffee is important. There's not a lot that gets done. AR 77. He'll go out and feed the horses and come in and take a nap. Sometimes Krista will turn around and if he's really tired, "neurofatigued as it's called" and he doesn't speak much and he just has – he's laying down, sometimes he'll say I need to go lay down. AR 77. Krista testified that "In fact, I look and I can see his eyes drooping, so I mean, that's just a fact of life, you know, and that's common with people with brain injuries." AR 77.

Krista testified in response to questions from the Administrative Law Judge about the trip they took on their trike. AR 77. Krista said that trip had been planned for five years (prior to his stroke) and it was postponed again and again. AR 77. They had got a trike thinking that it would be safer for him than a motorcycle. They took breaks and had two hotels scheduled the first day. AR 78. "We left Rapid City because we didn't know how far he would be able to get because of his fatigue and our friends are very aware of that and followed behind." AR 78. On the way, some of the friends that traveled behind them would stop them and tell plaintiff if he would getting too close to the center line. She felt like we were all lucky to get home alive. AR 78. Kristia testified

"we broke the trip down, we took breaks after maybe two hours and it went well actually." AR 78.

Krista encourages plaintiff to keep up with recreational activities, including rafting and skiing. AR 79. She explained "That is his personality. I mean, you know, you can't go back. Your life changes a whole lot and it does a flip, but there are some things that you need to keep going and we are lucky enough to live on property where we have two old horses. He grew up on a ranch, so, and that was – to me, that's his therapy, that we had those horses for him to feed every day. Skiing is something that he introduced me to many years ago and he loves it. His one friend, Joe, you know, a lot of friends fell off, but Joe stuck with him and loves to ski and would take Sarge skiing and so, yeah, I mean, there is no reason why he shouldn't stay in the saddle and get back on. He can do it, you know, so." AR 79.

Krista testified these activities and the trips cause him more fatigue with longer recovery. AR 79.

Krista testified "with a brain injury a lot of things change. Personalities are affected too, but basically in his situation that love and desire to be outdoors, you know, he could do that. I mean, ya, and he should do that and I still think he should do that." AR 80.

She explained you just have to compensate for the deficits that he has. "That's what we learned at Rusk is you compensate for his deficits which is with neurofatigue, rest, and things gang up on you if you don't get your rest, you know, no matter what he's done." AR 80.

37

From Krista's observations, she does not believe he could go out and do any type of gainful employment on a full time schedule. AR 80. She testified "I think he could do a couple hours you know . . . two hours and take a nap or something. I also know that he has to write things down, you know, to keep things straight." AR 80.

Krista testified "I'm not a vocational rehab counselor, but I have been an employer and when you have an employee and, you know, they need to be alert . .. you would make accommodations for them, I guess, to take a nap every couple hours. I mean, who does that?" AR 80-81.

Krista testified that she has to remind him of things and oversee things. She stated "Maybe I should do it more than not, but one of those things that I believe is that he needs to get his self-confidence back." AR 81.

So Krista does let him do a lot of these things on his own but she'll be looking out the window. She thinks at times that maybe they should get rid of the horses. But he's a farmer/rancher guy and has a lot of experience in it. But she does peek out at him to make sure that he's still alive. There are times when she's gone outside to look for him when she didn't see his red jacket, but she doesn't want to be the nagging wife. AR 82.

### 3. Vocational Evidence

Bill Tysdale testified as a vocational expert at the Social Security Hearing on April 9, 2015. AR 83-85. Mr. Tysdale was asked to identify jobs an individual could perform assuming he has no exertional limitations, was limited to performing unskilled work consisting of one to three steps; and

cannot work at a production quota rate, but can perform goal oriented work. AR 84. Tysdale responded there would be occupations within those limitations, including the unskilled, medium kitchen helper job. AR 84.

Tysdale was asked whether an individual could perform that job if they would be off task 25% of the work day and had the same limitations as in this first hypothetical. He responded no. AR 84.

Tysdale testified this was a low stress job. AR 85.

If this individual could focus for two to three hours at a time, and needed additional work breaks of at least 15 mintues within these two to three hours periods throughout the day, Tysdale responded the individual could not perform this job. AR 85.

Tysdale testified that anything beyond the normal work breaks would not provide for full time employment. AR 85.

**F.     ALJ Decision**

The ALJ issued a partially favorable decision dated August 31, 2015, finding plaintiff met the requirements of disability as of March 2014, but was not disabled prior to that date. AR 12-36.

The ALJ found plaintiff met the insured status through December 31, 2014. AR 18.

The ALJ found that despite being paid significant sums of money as reflected on his earnings statement following the onset date of 2009, that plaintiff has not performed substantial, gainful activity. As the plaintiff's

earnings were a subsidy and not earnings attributable to productive work activity and therefore do not constitute substantial, gainful activity.  AR 18-19.

Since the alleged onset date of disability of November 14, 2009, plaintiff has had the following severe impairments:  status post cerebral vascular accident with organic mental disorder and mood disorders.  AR 19.

The ALJ found that plaintiff's impairments did not meet or equal any listings.  AR 20.

The ALJ found that plaintiff had mild restrictions on activities of daily living, mild difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence and pace, and no episodes of decompensation of extended duration.  AR 21.

The ALJ found the plaintiff had the following residual functional capacity prior to March 1, 2014: plaintiff could perform a full range of work at all exertional levels but with the following non-exertional limitations:  unskilled work consisting of one to three steps.  And that plaintiff can work in jobs requiring goal oriented work but perform no jobs requiring production quotas. AR 22.

The ALJ concluded that beginning March 1, 2014, the plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations.  The plaintiff can perform unskilled work consisting of one to three steps.  The plaintiff can work in jobs requiring goal-oriented work, but can perform no jobs requiring production quotas.  The plaintiff can perform work in a low stress work

environment, requires one 15 minute rest break in addition to customary breaks, will be off-task twenty-five percent of the work day due to his symptoms, can focus on job related tasks for two or three hours at a time, and can work a total of four hours per workday.  AR 27.

The ALJ found that plaintiff could not perform his past relevant work at any time since November 14, 2009.  AR 29.

The ALJ found that beginning March 1, 2014, and and continuing, plaintiff could not perform any jobs existing in significant numbers in the national economy. AR 30.

The ALJ found that the Vocational Expert testified that prior to March 1, 2014, plaintiff could perform a representative sample of unskilled jobs such as kitchen helper.  AR 30.

The ALJ found plaintiff was entitled to a period of disability and disability insurance benefits beginning on March 1, 2014, and continuing.  AR 31.

**G.** **Issues Before This Court**

Dr. Preston raises two issues before this court:  (1) did the ALJ err in evaluating Dr. Lord's opinion evidence and (2) did the ALJ err in evaluating Dr. Preston's credibility as to the effects of his impairments.

## DISCUSSION

**A.** **Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627

(8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Woolf v. Shalala 3 F.3d 1210, 1213  (8th Cir. 1993).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311

(8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith</u>, 982 F.2d at 311.

**B.      The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential  analysis is mandatory for all SSI and SSD/DIB applications.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the

applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If  the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's

RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.  Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.  Whether the ALJ Erred in Evaluating Dr. Lord's Opinion

### 1.  Law Applicable to Treating Medical Source Opinions

The court notes first what is not at issue:  whether Dr. Preston engaged in substantial gainful activity at step two.  Although the Commissioner spends some effort discussing Dr. Preston's income post-November, 2009, neither party has appealed the Commissioner's conclusion that Dr. Preston did not engage in SGA during the period of alleged disability.  Accordingly, that issue is not before the court.

Dr. Preston argues the ALJ erred in discounting the opinion of his treating psychiatrist, Dr. Charles Lord. Medical opinions from acceptable medical sources are considered evidence which the ALJ will consider, along with all relevant record evidence, in determining whether a claimant has an impairment, the nature and severity of the impairment, and the claimant's RFC. See 20 C.F.R. § 404.1527(a)(2). All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;
>
> --whether the person giving the medical opinion treated the claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;
>
> --the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;
>
> --whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and
>
> --whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

The Commissioner will give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment if (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) the opinion is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016).  "A treating physician's opinion, however, 'does not automatically control or obviate the need to evaluate the record as a whole.' " Nowling, 813 F.3d at 1122-23 (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).  If the opinion of the treating physician is inconsistent, or if other medical evaluations are "supported by better or more thorough medical evidence" the ALJ may be entitled to discount or even disregard a treating physician's opinion.  Nowling, 813 F.3d at 1123; House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007); Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing

alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008)(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007)).

Certain ultimate issues are reserved for the Commisioner's determination. 20 C.F.R. § 404.1527(d). Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination." House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 416.927(e)(3). The ultimate issues reserved to the Agency are as follows:

1.  whether the claimant is disabled;

2.  whether the claimant is able to be gainfully employed;

3.  whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.  what the claimant's RFC is; and

5.	what the application of vocational factors should be.

See 20 C.F.R. § 404.1527(d)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine.  20 C.F.R. § 404.1527(d)(2); Cox, 495 F.3d at 619-620.  In evaluating a treating physician's opinion, the ALJ must "always give good reasons" supporting her decision regarding the weight afforded that opinion.  Nowling, 813 F.3d at 1123; Reed, 399 F.3d at 921; 20 C.F.R. § 404.1527.

In the Nowling case, Nowling's treating physician described her in a medical source statement as seriously limited or unable to meet competitive standards such as the ability to maintain regular attendance at work and be punctual, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to respond appropriately to changes in work routine, and to deal with stress of semiskilled and skilled work.  Nowling, 813 F.3d at 1117.  The ALJ discounted this treating physician's opinion of Nowling's functional abilities, claiming it was inconsistent with other (nontreating) experts' opinions and with the treating physician's own records.  Id. at 1123.  In support of his opinion, the ALJ highlighted one entry in the

treating physician's notes showing Nowling had a GAF of 56 and had demonstrated "improvement."[10] Id.

The court held the GAF score was "of little value" and, in any event, Nowling had consistently had GAF scores of 45 to 50 over the course of two years and 38 therapy sessions. Id. at 1115-16. The one-time GAF score of 56 was an anomaly. Id. Furthermore, in highlighting the fact that Nowling exhibited improvement on one occasion, the ALJ failed to recognize that Nowling's mental impairments waxed and waned over a substantial treatment period, that her symptoms were unpredictable and sporadic, and that her structured living environment had an effect on the manifestation of her symptoms. Id. Here, the court held, the ALJ failed to give good reasons for discounting the treating physician's opinion because the ALJ failed to acknowledge the nature of the mental disorder at issue and the longitudinal treatment record. Id. The court remanded to the agency. Id.

In the House case, the ALJ's decision disregarding the treating physician's opinion was affirmed, in large part because there were "profound" inconsistencies between the treating physician's opinion on the one hand, and the medical evidence and the claimant's own testimony on the other. House, 500 F.3d at 744-745. The ALJ had determined that the claimant suffered from a severe impairment that left him unable to perform his past relevant work, but

---

[10] See Footnote 7, *supra*, for a description of GAF.

that he retained the RFC to perform certain unskilled sedentary jobs. <u>Id.</u> at 742. The key issue as to the claimant's ability to perform unskilled sedentary work turned on whether he could sit for prolonged periods of time. <u>Id.</u> at 743-745.

The medical records established restrictions on the claimant's ability to stand and walk, but not on his ability to sit. <u>Id.</u> The claimant's own statements in questionnaires and testimony at the hearing also indicated that his impairment affected his ability to stand and walk, but not to sit. <u>Id.</u> The treating physician's opinion that there were significant limitations on the claimant's ability to sit came only in response to a letter from the claimant's lawyer and only after the case had been remanded from the Appeals Council back to the ALJ for additional findings. <u>Id.</u> at 743. Under these facts, the ALJ was justified in finding that the treating physician's statement was inconsistent with the medical evidence on the whole. <u>Id.</u> at 743-745.

In <u>Dolph v. Barnhart</u>, 308 F.3d 876, 876 (8th Cir. 2002), the claimant alleged disability from a combination of kidney disease which caused hypertension, degenerative disease of the cervical spine, and carpal tunnel syndrome. The ALJ denied benefits, finding that the claimant retained the RFC to perform past relevant work. <u>Id.</u> at 878. In reaching this conclusion, the ALJ disregarded a portion of the RFC assessment completed by the claimant's kidney doctor. <u>Id.</u> at 878-879. This was assigned as error by the claimant on appeal. <u>Id.</u>

The Eighth Circuit affirmed, noting that the ALJ fully credited the treating physician's opinion about the claimant's kidney disease because this was within the treating physician's area of specialty. Id. at 879. However, the ALJ gave less weight to the kidney doctor's RFC assessment of the claimant's cervical spine degeneration and carpal tunnel. Id. The kidney doctor had not treated the claimant for these neck and arm conditions and had not made any clinical findings concerning these conditions. Id. The Eighth Circuit found that the ALJ's analysis of the kidney doctor's RFC assessment was consistent with the regulations governing how medical opinions are to be weighed and evaluated. Id. See also Reed, 399 F.3d at 922 (noting that less weight may be accorded to a treating physician's opinion where that opinion concerns a condition outside the physician's specialty, for which he did not treat the claimant and as to which he had not made any clinical findings).

In Wagner, the Eighth Circuit affirmed the ALJ's decision to discount a particular medical opinion of the claimant's treating physician where that particular opinion was inconsistent with two other opinions he gave about the claimant on the same subject on two other occasions, one predating the opinion that was discounted, and one postdating that opinion. Wagner, 499 F.3d at 849-850.

In evaluating a medical source opinion, the ALJ was required to consider whether the medical source had treated the claimant, how long the treatment relationship had lasted, and whether the medical source had examined the claimant. 20 C.F.R. § 404.1527.

## 2. Dr. Lord's Opinions & the ALJ's Treatment of Them

Applying the above law in Dr. Preston's case, it is helpful to review the evidence. The ALJ gave "great weight" to some of Dr. Lord's opinions and "little weight" to others. Only the ALJ's decision according "little weight" is at issue, so a description of the opinion evidence is important for clarity.

### a. Opinion to Which "Great Weight" Was Given

Dr. Lord gave an opinion dated December 7, 2014, which the ALJ gave "great weight" to. AR28. That opinion was in response to a letter from Dr. Preston's lawyer explaining Dr. Preston's own account of his deficits. AR888. In the letter, Dr. Preston's testimony at the hearing is prefigured: due to neurofatigue, he needs to rest for 10 to 15 minutes every couple of hours and these rests sometimes turn into 2 to 3 hour naps. Id. Based upon Dr. Preston's own description of the effect of his impairments, Dr. Lord was asked to answer two questions. AR889.

First, are Dr. Preston's description of his symptoms and limits consistent with his medical condition? Id. Dr. Lord answered "yes," and expounded upon his answer. Id. Dr. Lord noted left frontal CVA impairs the emotions/attention, executive function, right motor activity and impulsivity/compulsivity related circuits in the human brain. Rest is required to partially compensate for these chronic dysfunctions due to circuit damage. Id.

Second, Dr. Lord was asked whether Dr. Preston's description of the rests he needed were necessary to help him maintain his function and, if so,

whether this need for rests would continue indefinitely? Id. Dr. Lord also answered this question "yes," and explained that generally the usual time frame to get back to what functions you can post-CVA traumatic brain injury is two years. Id.

The above opinions were **not** discounted by the ALJ. AR28. Dr. Preston does not take issue with that evaluation of Dr. Lord's opinion by the ALJ.

### b. Opinions to Which the ALJ Gave "Little Weight"

The ALJ **did** discount Dr. Lord's GAF scores, which appear throughout his notes, and Dr. Lord's functional opinions from December, 2010, and August, 2012, that Dr. Preston was "unable to work due to psychotic and neurological sequelae." AR 26-27. Therefore, it is towards these opinions that Dr. Preston's argument is directed.

### i. Functional Capacity Forms from 2010 & 2012

At AR781-83 are found three "Attending Physician's Statement" forms, each signed by Dr. Lord. AR781-83. Each bears a "policy number" at the top of the page. Id. Each also bears a notation at the bottom of the page "Page 2 of 4." Id. Pages 1, 3 & 4 of the form are not in the record, so it is difficult to definitively identify what these documents are. They may be a form submitted to a disability insurance company to determine whether Dr. Preston should continue to receive disability insurance benefits. This surmise is bolstered by the fact that the forms contain only one specific question as to function—can the patient endorse checks and direct the proceeds thereof. See AR781-83. An entity that was issuing checks to Dr. Preston would want to know this

information so as to know whether a guardianship or benefits-payee should be set up.

The three forms are dated December 13, 2010 (AR783), January 18, 2012 (AR781), and August 25, 2012 (AR782). In her opinion, the ALJ mentions only the opinions expressed in the first and last form, not the intervening middle form. As can be seen below, the three forms represent Dr. Lord's evolving opinions as to Dr. Preston's condition over the 20-month period encompassed by the forms.

The December 13, 2010, form states Dr. Preston's subjective symptoms are: memory problems, mood swings, and insomnia. AR783. Dr. Lord lists his objective findings as: executive dysfunction, anxiety/dysphoria, and insomnia. Id. Dr. Lord recorded his opinion that Dr. Preston was competent to endorse checks and direct the use of the proceeds thereof. Id. Dr. Lord stated there were limitations and restrictions on the patient's work activities solely due to his medical condition. Id. When asked to explain that answer, Dr. Lord wrote "cannot return to work as physician." Id. He stated this condition began November, 2009, and was ongoing. Id. When asked whether the condition would continue into the future unchanged, or with fundamental change, Dr. Lord responded "unknown." Id. Dr. Lord stated the patient was a suitable candidate for medical rehabilitation and that it was unknown whether a job modification would allow the patient to return to work even with his impairment. Id. When asked if the patient was suitable for vocational rehabilitation, Dr. Lord answered affirmatively. Id. But when asked what

specific limitations and restrictions would apply to vocational rehabilitation, he wrote it was too early in the recovery process to evaluate. Id.

There is an intervening evaluation form dated January 18, 2012, that was not discussed in the ALJ's written opinion. AR781. On this date, Dr. Lord diagnosed mood disorder arising from CVA-AV malfunction. Id. He listed Dr. Preston's subjective symptoms to be: anxiety, mood swings, depression, and executive dysfunction. Id. He listed identical objective findings, except that "dysphoria" was listed in place of depression. Id. Dr. Lord noted that Dr. Preston's psychiatric antidepressants had been discontinued because of severe agitation. Id. Dr. Lord stated the patient was competent to endorse checks and direct the use of the proceeds thereof. Id. Dr. Lord again opined the patient had limitations and restrictions to his work activities solely due to his medical condition that rendered him "unable to work due to psychotic/neurological sequelae." Id. Dr. Lord stated the patient's restrictions began November 14, 2009, and the date they would end was undetermined. Id. Dr. Lord opined it was undetermined whether there would be a fundamental or marked change in the patient's condition in the future. Id. He again opined Dr. Preston was a suitable candidate for medical rehabilitation. Id. At this point, Dr. Lord stated it was "unknown" whether Dr. Preston could perform his job with modifications given his impairment. Id. Dr. Lord indicated that answering this question would require follow-up with Dr. Cotes, neurology. Id. Also, as in the December, 2010, statement, Dr. Lord stated it was undetermined whether the patient would be a suitable candidate for vocational

rehabilitation.  Id.  When asked what specific limitations and restrictions Dr. Lord would place on vocational rehabilitation, he stated he would "observe psychiatric interface (e.g. level of anxiety/depression).  Id.

A third identical form was filled out by Dr. Lord on August 25, 2012. AR782.  On this date, Dr. Lord diagnosed mood disorder arising from CVA-AV malfunction.  Id.  He listed Dr. Preston's subjective symptoms to be:  anxiety, mood swings, depression, and executive dysfunction.  Id.  He listed identical objective findings.  Id.  Dr. Lord again opined the patient had limitations and restrictions to his work activities solely due to his medical condition that rendered him "unable to work due to psychotic/neurological sequelae."  Id. Dr. Lord stated the patient's restrictions began November 14, 2009, and were ongoing.  Id.  Dr. Lord opined there would be no fundamental or marked change in the patient's condition in the future.  Id.  He again opined Dr. Preston was a suitable candidate for medical rehabilitation.  Id.  This time, Dr. Lord opined the patient was definitely not able to work with a job modification given his impairment.  Id.  He stated it was unknown whether Dr. Preston was suitable for vocational rehabilitation.  Id.  When asked what specific limitations or restrictions Dr. Lord would place on vocational rehabilitation, he stated he would "observe psychotic/neurological interface (e.g. anxiety/depression, etc.)"  Id.

The ALJ gave "little weight" to these opinions of Dr. Lord, writing them off on the basis that they were referring only to his ability to work as a physician and were not relevant to the larger question whether Dr. Preston was capable

of doing any work on a sustained basis.  AR27.  The ALJ also discounted the opinions because Dr. Preston's activities of daily living for the same corresponding time indicated he retained a high level of function.  Id.  The ALJ then listed a litany of physical activities Dr. Preston engaged in, from mowing to rafting and skiing.  Id.

The first reason given by the ALJ for discounting the opinions—that they related solely to Dr. Preston's ability to peform the job of a physician—is not a fair characterization of the documents.  It is probably true that the opinions were rendered at the request of Dr. Preston's disability insurer, but the questions on the forms and the information documented by Dr. Lord thereon went beyond the question of returning to work as a physician.  For example, the form documented Dr. Preston's subjective complaints and Dr. Lord's objective observations.  It recorded what the effects of the impairment were, when those effects started, and, most importantly, their duration.

In December, 2010, Dr. Preston was only one year post-CVA and Dr. Lord stated it was too early to tell what functions Dr. Preston may regain.  AR783.  This is consistent with Dr. Lord's December, 2014, opinion to which the ALJ gave "great weight" in which Dr. Lord explained that the improvement in function following a brain injury such as Dr. Preston's would continue for about two years post-incident, after which the functions regained become static and no further improvement can be expected.  AR888-90.  In August, 2012, Dr. Preston was then outside that two-year window post-CVA.  Accordingly, Dr. Lord's projection of the functional abilities Dr. Preston was likely to regain

had solidified. AR782. Dr. Lord could not say whether Dr. Preston was a good candidate for vocational rehabilitation—i.e. training for a different job than the one he previously held—but he stated whether that vocational rehabilitation would work depended on monitoring the "psychotic/neurological interface (e.g. anxiety/depression, etc.)" Id.

Dr. Lord's own records from pre-March, 2014, are consistent with his December, 2010, and August, 2012, opinions. He documented numerous times that Dr. Preston was experiencing signifigant fatigue and sleeping issues. See, e.g. AR777-78 (fatigue, forgetful, sleep issues 6-4-10); AR774 (fragile and fatigued 6-14-10); AR774 (sleep problems on rafting trip 7-5-10); AR772 (fatigue 7-26-10); AR771 (fatigue 8-9-10); AR770 (fatigue and low energy, sleeping in waiting room 8-30-10); AR768 (sleeping 4-5 hours in daytime 12-21-10); AR768 (problems with neurocognitive function 5-9-11); AR765 (neurocognitive difficulties 8-31-11); AR762 (plaintiff skiing but fatiguing easier 3-8-12); AR755-56 (neurofatigue requires naps 9-16-13). Those records are substantially the same after March 1, 2014. See AR870 (neurofatiguing and needing naps 3-3-14); and AR873 (works around property but gets fatigued easily and must nap 9-10-14).

Nor are Dr. Lord's records inconsistent with other record evidence before the ALJ. Dr. Lord received status reports from the NYU brain program, which was replete with documentation of Dr. Preston's neurofatigue and decreased stamina. See, e.g. AR512,, 598, 599, 600, 602, 604, 624, 626, 627 (documenting numerous instances of neurofatigue, including that plaintiff was

"prone" to neurofatigue, needed frequent breaks due to neurofatigue—late 2010 through spring 2011).  As the Commissioner points out, there were numerous days during the NYU program when Dr. Preston did well in terms of his neurofatigue and did not need excessive breaks or naps.  But there was substantial evidence to the contrary on just as many days, which only demonstrates that Dr. Preston's neurofatigue, and the effect it had on him, waxed and waned, like most mental impairments.  Nowling, 813 F.3d at 1114-15, 1123.  Furthermore, Dr. Preston's neurofatigue and just plain fatigue were conditions that dated back to the period immediately after Dr. Preston experienced his CVA.  See AR432 (increased need for sleep, fatigue, sleep disturbances, forgetfulness, difficulties in concentration and attention 2-16-10) (Dr. Scott Cherry).

The ALJ discussed evidence from Dr. Preston's occupational and speech therapists (AR23-24 (citing AR420-25)), but none of that evidence contradicts Dr. Lord's opinions as to his patient's ability to function given his neurofatigue and need for breaks/naps.  The ALJ pointed to a November 5, 2010, record from NYU finding Dr. Preston's concentration and attention were within normal limits.  AR25 (citing AR493-94).  This, the ALJ asserted, is "highly probative evidence that claimant has the residual mental capacity to perform unskilled work of 1-3 steps."  AR25.  However, the ALJ does not note the numerous documentations in the NYU records of Dr. Preston's neurofatigue cited above.  Nor does the ALJ take into account the NYU evaluation of Dr. Preston a few

months later recommending he enroll for another course of treatment to address his continuing deficits.  AR496.

The ALJ also discussed Dr. Christina Cote's April 27, 2010, record in which she discussed disability with Dr. Preston.  AR25 (citing AR427).  The somewhat misleading impression the ALJ's recitation gives is that Dr. Cote felt Dr. Preston could return to work as a physician with a few small tweaks, such as having a physician's assistant in the room with him when treating patients.  AR25.  A consideration of the full record shows Dr. Cote advised Dr. Preston he had "pronounced deficits in auditory recognition, executive function, access to semantic memory, verbal fluency, hypothesis testing and generation" based on Dr. Cherry's February evaluation.  AR427.  Dr. Cote further told her patient he had "impairments in psychomotor speed and processing speed."  Id.  Dr. Cote noted Dr. Preston had "some hesitancy and almost a stuttering quality to speech but it is not actually searching for words but it almost seems like his brain is reviewing how I will interpret what he is about to say and so he is rethinking his phrasing."  Id.  Dr. Cote noted plaintiff had "difficulty reading." Id.  Dr. Cote recorded that plaintiff had depression and anxiety giving rise to forgetfulness, confusion, and difficulties in concentration and attention.  Id. Dr. Cote discussed the possibility of plaintiff returning to work, and suggested he do some "soul searching" and take deeply into account his condition.  Id. They discussed disability, but Dr. Cote stated any determination in that regard would have to await Dr. Cherry's next evaluation.  Id.  Thus, when one looks at

the evidence relied upon by the ALJ in context and in full, it does not support the propositions asserted in the ALJ's written opinion.

The ALJ also seized on a statement in Dr. Preston's August 5, 2011, discharge summary from the NYU program to the effect he was "enthusiastic" about helping his wife run their medical business administratively. AR25 (citing AR443). What the ALJ fails to acknowlege was that Dr. Preston's attempt to perform administrative tasks at the clinic ended in dismal failure. He worked only 1-2 hours a day, couldn't keep information straight, and had to take frequent naps. AR70-71. The fact that Dr. Preston wanted to work in a productive capacity is not evidence that he was *able* to do so.

Before this court, the Commissioner points to several records from Dr. James Bowman in which Dr. Bowman recorded plaintiff reported *no* memory problems. Dr. Preston argues that the visits with Dr. Bowman were for treatment of Dr. Preston's prostate cancer, lasted only 30 minutes, and that Dr. Bowman is an internist who does not specialize in mental conditions. Some of this is true. Dr. Bowman's records demonstrate that most visits were for 25 minutes only. However, Dr. Preston was being seen by Dr. Bowman post-CVA during 2010 and the first half of 2011, prior to his August 31, 2011 (AR655) cancer diagnosis, so Dr. Bowman was not treating Dr. Preston exclusively for cancer. Dr. Preston's point that Dr. Bowman is a doctor of internal medicine is, however, well taken. He does not specialize in diseases or impairments of the brain. Opinions of specialists like neuropsychologist Dr. Scott Cherry and psychiatrist Dr. Charles Lord are accorded greater weight

than Dr. Bowman's opinion as to plaintiff's mental status because Dr. Lord and Dr. Cherry specialize in the treatment and evaluation of brain disorders whereas Dr. Bowman does not.  See 20 C.F.R. § 404.1527(a)-(f); Wagner, 499 F.3d at 848; Dolph, 308 F.3d at 879.  These brain specialists found significant impairment.  AR43-33, 888-90.  In any case, there is also evidence in the record that Dr. Preston's neurofatigue is a condition that waxes and wanes and it is this condition that affects his memory, concentration and attention.  The ALJ did not address the basic nature of Dr. Preston's condition.

Finally, Dr. Lord's opinions from December, 2010, and August, 2012, are consistent with Dr. Preston's daily activities from mid-2010 to the time of the ALJ hearing.  Dr. Preston reported in his earliest function report that he needed 2 naps daily due to neurofatigue and could only concentrate for a couple of hours before needing a break.  AR252 (10-3-13).  Dr. Preston reported this condition consistently from the time of the first function report through the date of the ALJ hearing.  Id.; AR263, 272, 53, 55, 60-61, 65.  Dr. Preston related that this condition had been with him since the CVA event in November, 2009.  AR263, 267 (12-13-13).  Dr. Preston's wife also corroborated his neurofatigue and need for daily naps.  AR70-71, 77, 78, 80-81, 301.

The ALJ relied on Dr. Preston's activities of daily living, including his recreational activities, to discredit Dr. Lord's 2010 and 2012 opinions.  But the ALJ never explained *why* these daily activities were inconsistent with Dr. Lord's opinions.  Although Dr. Preston is a man of relatively good physical health and

strength, that does not undermine his stated neurofatigue and need for breaks, including naps, every couple of hours. For example, although Dr. Preston skied, he could only ski for about 60 to 90 minutes before fatiguing. AR762. He took a trip on a motor trike, but his wife planned the route to include breaks every couple of hours, including multiple hotel reservations in case he were unable to go more than two hours. AR78. Dr. Preston works around his property feeding dogs and two horses and mowing, but fatigues easily and has to take breaks every couple of hours. AR873. He took a trip to the Grand Canyon with his family, but it was too fatiguing for him and he would not take a trip like that again. AR873.

The crux of the ALJ's finding that Dr. Preston was disabled from March 1, 2014, forward, was his need for breaks or a nap every couple of hours. No matter the job, no employer would employ a person who needed those frequent of breaks. What is missing from the ALJ's analysis is why this condition was not disabling *prior* to March 1, 2014, when the records consistently document this condition existed prior to March, 2014. What is also missing from the ALJ's analysis are the "good reasons" for discounting Dr. Lord's 2010 and 2012 opinions, particularly under the facts of this case: the evidence is consistent both before and after the date (March 1, 2014) that the ALJ found Dr. Preston to be disabled. The court concludes this matter must be remanded for the ALJ to consider Dr. Lord's opinions from 2010 and 2012 in light of all the evidence in the record and to analyze those opinions under the rubric set forth by the Commissioner for analyzing opinions of treating physicians. <u>Nowling</u>, 813 F.3d

1114-15, 1123 (remanding where the ALJ discounted treating physician's opinion while ignoring the nature of the impairment and the longitudinal record about the impairment).

### ii.    GAF Scores

The other opinion evidence from Dr. Lord that the ALJ discounted was the GAF scores Dr. Lord recorded in his records.  AR26.  The ALJ explained she was giving little weight to these scores for a number of reasons.  Id.  A GAF score is a single snapshot in time and is subjective.  Id.  Also, the ALJ stated a GAF does not indicate the *cause* of impaired functioning or what *functions* are impaired.  Id.  For example, the GAF scores Dr. Lord assigned to Dr. Preston may have been due to economic or environmental factors unrelated to his mental functional capacity.  Id.  Finally, the ALJ noted there was other, more informative information in the record to which the ALJ gave more weight.  Id.

As to this issue, the court affirms the ALJ's decision to give "little weight" to the GAF scores Dr. Lord assigned to Dr. Preston.  GAF stands for Global Assessment of Functioning.  GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most healthy mentally.  A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty.  Nowling, 813 F.3d at 1115 n.3.  Both the Eighth Circuit and the Commissioner have recognized that GAF scores have limited importance.  Id.  The "Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability

65

programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." Id. (quoting Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)).

The Diagnostic and Statistical Manual of Mental Disorders ("DSM")-IV (American Psychiatric Assn. 2000), previously contained references to GAF. The new DSM-5 (May, 2013), dispensed with the GAF score.

To be sure, this case is distinguishable from the Nowling case, discussed *supra,* where the ALJ plucked a single higher GAF score from a multitude of lower scores to justify discounting a treating physician's opinion. Nowling, 813 F.3d at 1123. Here, Dr. Lord's GAF scores for Dr. Preston were uniformly in the 45-51 range (with one higher score of 54), indicating serious to moderate symptoms or difficulty in social, occupational, or school functioning. Nevertheless, the ALJ was correct in noting that the GAF score is not tied to Dr. Preston's impairment as the *cause* of his lower functioning. Dr. Preston's GAF scores are *some* indication of his ability to function, but not the most important indicator. This court cannot say the ALJ's decision to accord Dr. Lord's assigned GAF scores "little weight" was unsupported by substantial evidence. Therefore, as to this issue, the court affirms.

**E.     Whether the ALJ Erred in Evaluating Dr. Preston's Testimony**

The other issue raised by Dr. Preston is whether the ALJ erred in finding his testimony not credible that he was disabled prior to March 1, 2014. This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are

supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ reviews a claimant's subjective allegations . . . and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski[11] and apply those factors to the individual." Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

In determining whether to fully credit a claimant's subjective complaints, an ALJ must consider several factors, including: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). A claimant's subjective complaints may be discredited only if they are inconsistent with the evidence as a whole. Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency,

---

[11] Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of a disabling condition reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records reflected that he did not pursue ongoing evaluation or treatment for his pain and he did not seek or take pain medication on a regular basis. Wagner, 499 F.3d at 852-853. See also Baker v. Barnhart, 457 F.3d 882, 892-894 (8th Cir. 2006) (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living--full self-care, driving a car, shopping, and running errands--a medical source opined that the claimant engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In <u>Bentley v. Shalala</u>, 52 F3d 784, 785-786 (8th Cir. 1995), the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where the claimant had not sought medical treatment for his pain for a long period of time and was not taking any prescription medication for pain. In addition, the record reflected that the claimant had applied for a number of jobs during his claimed disability period. <u>Id.</u>

In <u>Harvey</u>, an ALJ who discredited the claimant's testimony as to limitations on his activities was affirmed where the evidence showed the claimant had made prior inconsistent statements to his physicians regarding his limitations and his asserted need to use crutches or a non-prescribed walker was inconsistent with statements made by the claimant on other occasions. <u>Harvey</u>, 368 F.3d at 1015-1016.

In <u>Guilliams</u>, 393 F.3d at 802-803, the Eighth Circuit affirmed an ALJ's discrediting of the claimant's subjective complaints of back pain where claimant used a cane, but no medical prescription for the cane existed; where several medical exams revealed the claimant to be in no significant distress; where MRIs of the spine revealed essentially normal findings; where the claimant's muscle mass was not atrophied despite his allegation of restriction of motion and diminishment of strength; where the claimant declined to follow medical advice regarding treatment of his pain; and where medical evidence demonstrated that pain medication alleviated the claimant's symptoms of pain.

In <u>Dolph</u>, 308 F.3d at 879-880, the ALJ's discrediting of the claimant's subjective complaints of pain from kidney disease and degenerative spine

disease was affirmed where the claimant's records of her kidney disease showed "consistently stable renal function" and there was no record support for "complaints of ongoing, severe, protracted discomfort."

In the Nowling case, discussed above, the ALJ found Nowling partially credible in that her condition existed, but the ALJ found non-credible Nowling's testimony regarding the disabling effects of her condition. Nowling, 813 F.3d at 1120. The Eighth Circuit remanded because the ALJ, in evaluating the claimant's testimony, failed to take into account the evidence in the record as a whole which supported the claimant's testimony and the nature of the claimant's condition itself. Id. at 1120-23. It is the above body of law this court applies to the review of the record in this case.

The ALJ found Dr. Preston's testimony about his condition pre-March 1, 2014, to be non-credible, but found his testimony about his condition post-March 1, 2014, to be credible. AR27-28. As with Dr. Lord's opinions from 2010 and 2012, the ALJ discredited Dr. Preston's pre-March 1, 2014, testimony based upon his activities of daily living, including work around his property, taking care of his personal needs, driving, and his recreational activities. AR27.

Although the court hesitates to disturb an ALJ's credibility finding, here remand is warranted for the same reasons discussed above concerning Dr. Lord's earlier opinons. The evidence of Dr. Preston's daily activities prior to March 1, 2014, is the same as after. Before the penultimate date, he drove, worked on his property, rafted, fed animals, and took care of his personal

needs. AR252. He continued to do so afterward. AR263, 272. In fact, he testified at the hearing before the ALJ on April 9, 2015, that he had completed a rafting trip just a couple of days prior to the hearing. AR59-61.

In addition, there are other Polaski factors supporting Dr. Preston's credibility not discussed by the ALJ. Dr. Preston was aggressive about seeking medical care and medication for his condition, as evidenced by the extensive medical records and his dedication to move to New York City for the better part of a year to work on improving his functioning. The observations of physicians contained in the extensive medical record created by Dr. Preston's efforts to seek medical care are congruent with his own description of his functioning. No suggestion of symptom exaggeration or malingering appears anywhere in this record. His wife's observations are also congruent with Dr. Preston's testimony; the ALJ never discusses Mrs. Preston's corroborating testimony. Dr. Preston never refused treatment or refused to take prescribed medication. The ALJ failed to consider the side-effects of Dr. Preston's anti-seizure medication which caused fatigue. And there are objective medical findings in excess supporting his condition and its effects on him. The ALJ was not required to discuss each of the Polaski factors, but here, the ALJ omitted discussion of nearly all the factors and the factors she did discuss did not support her conclusion.

This may well be a case where two ALJs could hear and read the same evidence and come to different conclusions about whether Dr. Preston is disabled. But the evidence does not show a marked change mid-way through

the period of disability. Either Dr. Preston is disabled or he is not, but his condition did not change appreciably for the better after November, 2011. Having found that Dr. Preston *was* disabled (a determination not called into issue before this court), the ALJ in this case did not support her rationale for finding that disability manifested itself mid-way between November, 2011, and April, 2015, the date of the hearing. The court therefore remands for the ALJ to consider Dr. Preston's testimony in light of all the <u>Polaski</u> factors, especially the nature of his impairment and the longitudinal record. <u>Nowling</u>, 813 F.3d at 1120-23.

**F.    Type of Remand**

For the reasons discussed above, the Commissioner's partial denial of benefits is not supported by substantial evidence in the record. Dr. Preston requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be developed, clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby

ORDERED that the plaintiff's motion to reverse (Docket 14) is GRANTED and the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED this 8th day of February, 2018.

BY THE COURT:

_VERONICA L. DUFFY_
United States Magistrate Judge